IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GERRITSEN BEACH INVESTMENTS, | § | |
| LTD., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:08-CV-1192-N |
| | § | |
| STEPHEN S. JEMAL, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

This Order addresses Plaintiffs Gerritsen Beach Investments, Ltd. ("GBI") and SSST Riviera Investments I, Ltd.'s ("SSST") motion for summary judgment [42]. Because the Court finds that there are no genuine issues of material fact, it grants the motion.

### I. ORIGINS OF PLAINTIFFS' COMPLAINT

This is a suit for breach of contract on a promissory note against Stephen and Sharon Jemal (the "Jemals"). The Jemals do not dispute the existence of the note or their failure to pay. Rather, they assert the affirmative defenses of economic duress and fraudulent inducement.

The Jemals sought to develop three properties in Brooklyn, New York: Gerritsen Beach, Mill Basin, and Sheepshead Bay. In order to facilitate the acquisition and development of the properties, they formed three limited liability corporations under New York law: SSJ Development of Gerritsen Beach I, LLC, SSJ Development of Mill Basin I Group, and SSJ Development of Sheepshead Bay, LLC.

ORDER – PAGE 1

Stephen Jemal received substantial assistance from his banker, Patrick Morris, throughout the course of the project. Through Morris, he became acquainted with a group of potential investors (the "Investors"), from whom he solicited equity to fund the project. In 2006, the Investors organized SSST as a Texas limited partnership to invest in SSJ Development of Mill Basin I Group and SSJ Development of Sheepshead Bay. In both cases, SSST owned an approximate 28% ownership interest in the company. In addition, they organized GBI as a Texas limited partnership to invest in SSJ Development of Gerritsen Beach I, again owning an approximate 28% ownership interest in the company.

Over time, the Investors became concerned about the progress of the Jemals' acquisition and development of the Brooklyn properties. At various times in 2007, they expressed their misgivings to Stephen Jemal as he sought funding for the project. In about August of 2007, they broached the subject of a buyout of their respective interests in the New York LLCs. Around this time, Stephen Jemal was seeking a major construction loan from Amalgamated Bank, which he contends was central to the continued viability of the project. The bank required some sort of consent or action by the Investors in order for it to provide the loan.[1] According to Stephen Jemal, "with closing imminent, Plaintiffs suddenly dug in their heels . . . . " Defs.' Br. in Supp. of Resp. at 5 [44-2]. He alleges that the Investors threatened to make it impossible for SSJ to close on the Almalgamated Bank loan unless he agreed to buy out their interests in the New York LLCs. *Id.* As a part of this strategy,

---

[1]The evidence the parties provide is unclear with respect to the exact demands of Amalgamated Bank.

Stephen Jemal alleges that the Investors lulled his banker – Patrick Morris – into sharing confidential information about his financial status.[2] Specifically, he claims that Morris either generated or conceived of generating a list of defaults by Stephen Jemal under the various operating agreements between the parties. *Id.* At this point, Jemal contends that he had two options: bankruptcy or a buyout.

Stephen Jemal made an initial buyout offer to the Investors on September 6, 2007. After some negotiation, the Jemals executed and delivered a promissory note (the "note") to SSST and GBI. Under the note, which both Stephen and Sharon Jemal signed, the Jemals agreed to pay SSST and GBI the sum of $6,200,000 by no later than January 15, 2008 in exchange for their interests.[3] In addition, the note required the Jemals to make a $500,000 principal payment on the date it was executed and another principal payment of $120,000 shortly thereafter, which they did. However, the Jemals failed to pay the remaining balance by the maturity date, leading to this lawsuit.[4]

---

[2]The Jemals allege that Patrick Morris and Robert Sullivan, one of the Investors, were close personal friends. In an affidavit, Stephen Jemal states: "Relying on his own insight into the timing of Defendants' financing, Patrick Morris conceived of and implemented a means to force Defendant to convert Plaintiffs' investment into a promissory note, and thereby not only spare his good friend a potential loss of his investment, but make his friend a little money and keep his friend from falling out of his employer's good graces." Defs.' Br. in Supp. of Resp. at 6.

[3]The note indicated that it would bear interest at the "highest lawful rate" if it was not paid in full on the maturity date. In addition, the Jemals agreed to pay reasonable attorneys' fees and collection costs in the event of default.

[4]According to the Jemals, the parties agreed to place the note in escrow until the funding for the acquisition and development of the Brooklyn properties went through. However, Zalman Schochet, the attorney that represented the Jemals in their negotiations of the note, has no recollection of this agreement. Pls.' App. at 37-38 [43-2]. Instead, he

From the time that the Jemals executed the note until SSST and GBI filed suit, Stephen Jemal sent various e-mails acknowledging his debt. For example, on December 26, 2007, he wrote: "Your group will have the balance of your money sometime between Feb 15th and Feb 28th." Pls.' App. at 9 [43-3]. On May 4, 2008, he wrote: "My word is my bond and my word is to you, that I will pay you. This will be over soon and you will see from banks evidence of funds and then you will get your money my friend." Pls.' App. at 16. However, to date, the principal balance remains outstanding.

SSST and GBI now seek summary judgment against the Jemals. First, they argue that there is no genuine issue of material fact with respect to the Jemals' breach of the note. Second, they assert that the Jemals fail to offer any competent summary judgment evidence in support of their affirmative defenses of economic duress and fraudulent inducement. Finally, they claim that Stephen Jemal ratified the note through his various emails, thereby waiving any right to void the contract based on the affirmative defenses he asserts.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party

_____

testified in his deposition that he put all of the agreed terms in the final version of the note. *Id.*

ORDER – PAGE 4

opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, courts need not sift through the record in search of triable issues. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by either (1) presenting evidence that affirmatively demonstrates the absence of any genuine issue of material fact, or (2) after adequate time for discovery, demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*. at 322–23.  Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  In doing so, the nonmovant may not rely on "naked assertions of an actual dispute" but instead "must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *In re Lewisville Props., Inc.*, 849 F.2d 946, 950 (5th Cir. 1988) (citing *Anderson*, 477 U.S. at 255–56).  Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

### III. THE JEMALS BREACHED THE TERMS OF THE PROMISSORY NOTE

In order to recover on a breach of contract claim, a plaintiff must show: "(1) the existence of a valid contract; (2) performance or tender of performance; (3) breach by the defendant; and (4) damages resulting from the breach." *Oliphant Fin., LLC v. Galaviz*, 299 S.W.3d 829, 834 (Tex. App. – Dallas 2009, no pet.) (citing *Hussong v. Schwan's Sales Enters., Inc.*, 896 S.W.2d 320, 326 (Tex.App. – Houston [1st Dist.] 1995, no writ)). The Jemals do not dispute that SSST and GBI satisfy these elements. Therefore, the Court finds that there is no genuine issue of material fact with respect to whether the Jemals breached the promissory note. The Court turns to the Jemals' affirmative defenses: economic duress and fraudulent inducement.

### IV. THE JEMALS FAIL TO SHOW ECONOMIC DURESS

The Jemals assert the affirmative defense of economic duress, which the Texas Supreme Court characterizes as "the result of threats which render persons incapable of exercising their free agency and which destroy the power to withhold consent." *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (quoting *Dallas County Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 877 (Tex. 2005)). The elements of an economic duress defense are: "(1) a threat to do something that the threatening party has no legal right to do; (2) some illegal exaction or fraudulent deception; (3) the restraint is imminent and such as to destroy a person's free will without adequate means of protection; and (4) the claimant's financial distress was caused by the party accused of duress." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995) (citing *Simpson v. MBank Dallas, N.A.*, 724

S.W.2d 102 (Tex. App. – Dallas 1987, writ ref'd n.r.e.)); *see also Lee v. Wal-Mart Stores, Inc.*, 34 F.3d 285, 289 (5th Cir. 1994); *Beijing Metals & Minerals v. Am. Bus. Ctr.*, 993 F.2d 1178, 1185 (5th Cir. 1993). The "mere fact that a person enters into a contract with reluctance, or as a result of the pressure of business circumstances, financial embarrassment, or economic necessity, does not, of itself, constitute business compulsion or economic duress invalidating the contract." *First Tex. Sav. Ass'n v. Dicker Ctr.*, 631 S.W.2d 179, 186 (Tex. App. – Tyler 1982, no writ); *see also Nat. Corp. Tax Credit, Inc. VIII v. JNP Props. Inc.*, 2009 WL 1161109, at *7 (Tex. App. – Austin 2009, no pet.).

The Jemals fail to provide competent summary judgment evidence to support their claim. First, they fail to show that the Investors threatened to do something that they had no legal right to do, and that the threat involved an illegal exaction or a fraudulent deception. *See McCallum*, 66 F.3d at 92. In general, the Jemals cite no law, contract,[5] or other source that prohibited the Investors from withholding their consent to the Amalgamated Bank loan or seeking a buyout of their respective interests. Although the Jemals summarily assert that the Investors unlawfully "lulled" Patrick Morris into sharing confidential information about them, they fail to cite any law or record evidence that suggests that (1) the relevant information was confidential material protected by law, or (2) the Investors illegally coerced Morris into providing it. Further, the Jemals do not show that the alleged "threats" made by

---

[5]Moreover, "the law, in general, is that the 'threat to break a contract does not in itself constitute duress.'" *McCallum*, 66 F.3d at 92 (citing *Harsville Mill v. United States*, 271 U.S. 43, 49 (1926); *Palmer Barge Line v. So. Petroleum Trading Co., Ltd.*, 776 F.2d 502, 505 (5th Cir. 1985)).

the Investors involved any particular illegal exaction or fraudulent deception.  Thus, the Jemals fail to demonstrate the first and second elements of their economic duress defense.

Second, the Jemals fail to show that the restraint they allege was "imminent and such as to destroy a person's free will without adequate means of protection."  *See id.* Although the Amalgamated Bank transaction was quickly approaching and negotiations were fast-paced, the Jemals fail to show that the compulsion was imminent.  Here, as in *Sudan*, the Jemals had adequate time to consult with professionals and actually proposed the buyout agreement they now assail.  *Sudan*, 199 S.W.3d at 292 (Tex. 2006) (granting summary judgment where the alleged victim "consulted with her accountant and attorney, and actually proposed the amendment she now assails"); *see also Saenz v. Martinez*, 2008 WL 4809217, at *5 (Tex. App. – San Antonio 2008, no pet.) ("Access to professional assistance and a party's decision to negotiate are factors to be considered when measuring a claim of duress.").  In addition, the Jemals fail to show that the Investors' alleged threats operated to destroy their free will without adequate means of protection.

Finally, the Jemals fail to show that the Investors caused their financial distress.  As a threshhold matter, the Jemals do not provide any factual support to indicate that Stephen Jemal would be forced into bankruptcy unless the Amalgamated Bank deal closed.  For example, they do not point to any bank statements that illustrate the Jemals' financial status at the time of the buyout.  Second, to the extent there was financial distress, the Investors did not cause it.  The Jemals center their briefing on the alleged misdeeds of Patrick Morris, their own banker and a nonparty to this suit.  According to the Jemals, the "weapon at [the

ORDER – PAGE 8

Investors'] disposal – a list of defaults – was either conceived by or generated by Defendant's banker, Patrick Morris."  Defs.' Br. in Supp. of Resp. at 6.  To the extent that Morris caused or contributed to their financial distress – whatever it may have been – his involvement is irrelevant to the Jemals' affirmative defense against the Investors in this suit. *See First Tex. Sav.*, 631 S.W.2d at 179 ("A charge of economic duress or business compulsion must be based on the acts or conduct of the opposite party . . . ."); *see also Simpson*, 724 S.W.2d at 102.

Because the Jemals fail to offer competent summary judgment evidence on every element of their economic duress claim, the Court grants SSST and GBI's motion for summary judgment on this affirmative defense.

## V. THE JEMALS FAIL TO SHOW FRAUDULENT INDUCEMENT

The Jemals also assert the affirmative defense of fraudulent inducement.  In order to demonstrate that they were fraudulently induced to execute the note, the Jemals must show that: (1) SSST and GBI made a material misrepresentation that was false; (2) SSST and GBI knew the representation was false when made or made it recklessly as a positive assertion without any knowledge of its truth; (3) SSST and GBI intended to induce the Jemals to act upon the representation; and (4) the Jemals actually and justifiably relied on the representation and, thereby, suffered injury.  *See Taft v. Sherman*, 301 S.W.3d 452, 457 (Tex. App. – Amarillo 2009, no pet.) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)); *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App. – Houston [14th Dist.] 2003, pet. denied).

Here, the Jemals allege that SSST and GBI fraudulently promised to hold the note in escrow and to withhold collection on it until the Jemals successfully funded the development and acquisition of the Brooklyn properties.  According to Stephen Jemal's affidavit, his attorney, Zalman Schochet, informed him of this alleged promise.[6]  SSST and GBI object that any statements made by Schochet constitute inadmissible hearsay.  The Court agrees and sustains the objection.  Because the only evidence that the Jemals offer is inadmissible for summary judgment purposes, the Court finds that they fail to demonstrate a genuine issue of material fact on this point.  *See Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial."); *Duplantis v. Shell Offshore, Inc*., 948 F.2d 187, 192 (5th Cir. 1991) ( "Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial and continuing the action would be useless.") (internal quotes and citations omitted).  Accordingly, the Court grants summary judgment in favor of SSST and GBI on the Jemals' affirmative defense of fraudulent inducement.

---

[6]The Court notes that Schochet has no recollection of an agreement to hold the note in escrow.  Pls.' App. at 38.  To the contrary, he stated: "As is my custom, documents are completed only after consulting and review with my clients, and I would have included all agreed upon terms in the documents after detailed discussions and review with Stephen Jemal."  Pls.' App. at 37.  Moreover, when asked "[d]id anyone tell you that this note was to be held in escrow?" Sharon Jemal answered "no."  Pls.' App. at 32.

## VI. STEPHEN JEMAL RATIFIED THE NOTE

SSST and GBI argue that, even if the Court were to assume, *arguendo*, that the Jemals offered sufficient evidence to survive summary judgment on their affirmative defenses, Stephen Jemal ratified the note. "Ratification is the adoption or confirmation, by one with knowledge of all material facts, of a prior act which did not then legally bind that person and which that person had the right to repudiate." *City of the Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 732 (Tex. App. – Fort Worth 2008, pet. dism'd) (citations omitted); *see also Meyer v. Cathey*, 167 S.W.3d 327, 331-32 (Tex. 2005) (citing *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 680 (Tex. 2000)) ("[A] party who does not have a continuing obligation to perform under a contract, but nevertheless continues to perform after learning of a fraud, ratifies the fraud and therefore cannot recover damages for the period of time when the party knew of the fraud."). Thus, "if a party by its conduct recognizes a contract as valid, having knowledge of all relevant facts, it ratifies the contract." *City of the Colony*, 272 S.W.3d at 723 (citing *Barrand, Inc. v. Whataburger*, Inc., 214 S.W.3d 122, 146 (Tex. App. – Corpus Christi 2006, pet. denied); *Barker v. Roelke*, 105 S.W.3d 75, 84 (Tex. App. – Eastland 2003, pet. denied)).

Here, Stephen Jemal acknowledged his duty to pay SSST and GBI, as required by the note, on more than ten occassions. Pls.' App. at 1-46. Even presuming that the Investors fraudulently induced the Jemals into executing the note by promising to hold it in escrow, by the time Stephen Jemal sent most of the emails at issue, he was aware that they did not intend to do so. For example, one of the Investors advised him: "FYI – the attitude of the

group is we didn't release our share for the deal so that you could get the loan based on a contingency to get paid." Pls.' App. at 16. Stephen Jemal responded "[y]ou know my word is my bond and my word is to you, that I will pay you.  This will be over soon and you will see from banks evidence of funds and then you will get your money my friend."  *Id*. The Court finds that summary judgment is appropriate with respect to SSST and GBI's claims against Stephen Jemal because, with knowledge of all relevant facts, he ratified the contract.

CONCLUSION

For the reasons provided above, the Court grants summary judgment in favor of SSST and GBI.

Signed April 9, 2010.

David C. Godbey
United States District Judge

ORDER – PAGE 12